Lauren F. TEUTSCH

v.

UNITED STATES.

Cong. No. 2-54.

United States Court of Claims.

April 7, 1961.

Rehearing Denied June 7, 1961.

Frank J. Roe, Butte, Mont., for plaintiff. Joseph J. McCaffery, Jr., Butte, Mont., was on the brief.

Frances L. Nunn, Washington, D. C., with whom was Acting Asst. Atty. Gen., Geo. S. Leonard, for defendant.

DURFEE, Judge.

This case has been referred to us by House Resolution 493, 83rd Congress, 2nd Session transmitting H.R. 3965, 83rd Congress, 1st Session. We are instructed to report on that bill particularly apprising the House of "findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant."

Plaintiff's claim is for the loss of expected profits as a result of mining lava talc rather than ceramic talc during World War II. Plaintiff acquired the leasehold to the Johnny Gulch Talc Deposits near Ennis, Montana in 1941, and he operated it thereafter as the Mountain Talc Mines. He has arrived at a figure which he claims represents his losses by applying the following formula. The ceramic talc operations at the mines realized a claimed average profit margin of 26 percent; had he expended the same amount of money on producing and marketing ceramic talc during parts of 1943, 1944 and 1945, as he did on lava talc, his total profits would have been $14,882.00. In addition, he claims that because he devoted his efforts to producing lava talc during the war at the insistence of the government he lost the markets which he would have had for ceramic talc for a period of three years following termination of the lava talc operations in November 1945. The lost profits for this period are claimed to be $10,026.00 resulting in a total claim of $24,908.00.

There were present at the Mountain Talc Mines deposits of both lava talc (sometimes called block talc) and ceramic talc. Both were of steatitic quality, meaning that they were a suitable dielectric material for electronic spacers and insulators. The ceramic talc was ground to powder and fashioned into electronic products by being combined with a suitable binder. The lava talc dielectric elements were fashioned or carved from whole pieces of the mineral. Inasmuch as lava talc is fragile great care in handling is required during its mining. Ceramic talc, on the other hand, can be removed by blasting since it must be reduced to powder anyway before it can be used. Lava talc is, therefore, relatively expensive to mine and it cannot usually be accomplished at a profit.

Until 1942, the plaintiff had worked as a tool salesman and had had no schooling or experience in mining. He had acquired the leasehold to the property called the Mountain Talc Mines in 1941 but the talc deposits were at that time undeveloped. In November 1942, the Bureau of Mines, at plaintiff's request, obtained analyses of ore samples from his leasehold. As a result of a favorable laboratory report the Bureau of Mines prepared War Minerals Report 178 which concluded that a superior grade of lava talc was to be found at the Mountain Talc Mines. In fact it was the most suitable such deposit of lava talc to be

found in the United States. The prewar supply of this mineral had come primarily from Italy and India but it had been cut off at the outset of the war. As a result of the report, the Bureau of Mines approved the building of an access road to the properties by the U. S. Forest Service.

After War Minerals Report 178 had been published the plaintiff and the Bureau of Mines entered into an agreement (more fully set forth in Finding No. 5) which granted the Bureau of Mines exploration rights on plaintiff's leasehold. The exploration work was subsequently described in War Minerals Report 343 in February 1945.

Prior to the publication of either of the reports, in January 1943, the Reconstruction Finance Corporation, which was interested in plaintiff's mine as a source of lava talc, had authorized a loan of $7,500 to the plaintiff who in turn executed two notes, due in January and June, 1944 in the amounts of $5,000 and $2,500, respectively. Pertinent portions of the loan agreement between the parties are set forth in Finding No. 7. Between March 1943 and November 1945, plaintiff produced 528,868 pounds of lava talc and about 2,925,000 pounds of ceramic talc.

Plaintiff submitted a claim for losses on the operation of his mines and for expected profits in the amount of $55,-932.37 to the RFC in 1946. In addition to the items presented in this suit, the claim included losses incurred in mining the lava talc, mitigation costs and settlement expenses. The RFC did not believe it had the authority to settle the claims for expected profits there asserted. But in July 1947, plaintiff and the RFC entered into a final settlement agreement pursuant to the Contract Settlement Act of 1944, 58 Stat. 649, 665, 41 U.S.C.A. § 117, wherein it was agreed "that all rights and liabilities of the parties under the Act shall cease forthwith and be forever released" and the sum of $24,-325.00 (less $6,774.96 representing the unpaid principal on plaintiff's loan from RFC) was authorized to be paid to the plaintiff.

■ The petition alleges no contractual obligation which supports the claim and the only statutory provision which could support it is section 17(a) of the Contract Settlement Act of 1944, supra, which provides, in pertinent part:

"Where any person has arranged to furnish or furnished to * * * a war contractor any material * * * related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instructions, or any other request to proceed from a contracting agency, the contracting agency shall pay such person fair compensation therefor."

The settlement agreement worked out pursuant to the Act between the RFC, on its own behalf and on behalf of the Metals Reserve Company, and the plaintiff was called a final settlement agreement and provided, in part, that all of the rights of the parties would be forever released. The plaintiff entered into this agreement knowing that the RFC was aware that portions of his claim were for lost profits and further knowing that it had rejected those portions because they lay outside of the scope of the Act. Nevertheless, no reservation of any portions of the claim as originally stated was noted in the settlement agreement. Rather the agreement purported to be in settlement of all rights under the Act. The execution of the agreement constituted a release, waiver, or abandonment of those portions of the claim relating to lost profits on ceramic talc. The only legal rights which plaintiff had were those created by the Contract Settlement Act which he released for a valuable consideration.

■ Furthermore, the statute of limitations of this court, section 2501 of

Title 28, U.S.C., operates to bar any legal rights which the plaintiff might have had. The petition pursuant to the legislative reference was filed on January 5, 1955, which date is not only more than six years after the date on which plaintiff ceased to mine lava talc, but also more than six years after he entered into the settlement agreement with the RFC.

Having examined the question of whether or not plaintiff has an equitable claim against the United States we are of the opinion that he has not. The RFC loan was made to Mr. Teutsch so that he could produce talc for the war effort and it was determined that the need for lava talc was of greater urgency than the need for ceramic talc. Consequently, he was urged on a number of occasions to concentrate his efforts on that type of production. However, he was never forbidden to produce ceramic talc.

It is true that the early advice about the possible utilization of plaintiff's claims in furthering the war effort envisioned the production and marketing of ceramic talc at a profit in order to offset the losses which would be incurred in the production of lava talc. It is also a fact that the ceramic part of plaintiff's operations never materialized to the point where it could offset the losses from lava production. However, the United States in its settlement under the Contract Settlement Act compensated plaintiff for his production losses. It assumed and discharged the obligation to make up the losses when no profitable ceramic sales developed to do it.

We feel that unless the United States was directly responsible for some restraint on plaintiff's production of ceramic talc or for the loss of markets for that item, there can be no equitable obligation upon the United States. And thorough examination of all of the evidence in the case convinces us that such was not the situation.

Without the money derived from the RFC loan, Mr. Teutsch could not have operated as efficiently nor could he have operated on the scale which he did. In addition to the funds made available to plaintiff from the loan, the defendant offered advice and assistance directed toward the production and marketing of talc. It obtained the services of an experienced foreman to oversee operations and the exploratory work of the Bureau of Mines went on during the period of plaintiff's wartime production. It appears, however, that the advice of the experienced persons connected with the operations was not always followed.

The problem of securing and retaining markets for ceramic talc is a complex one involving experience in mining, research and business administration. The cultivation of customers whose specific needs can be satisfied requires a much more intensive effort than does the marketing of metallic ores. The plaintiff did not have significant markets for ceramic talc at the beginning of the period for which the claim is made. It is doubted that he had enough experience and know-how in this field at this time to have successfully developed ceramic markets even had he had greater resources.

The mine itself was a promising "prospect" but it had not been developed to produce either kind of talc with the efficiency demanded to compete successfully. To have attained such a degree of development would have required expensive and extensive improvements in the producing facilities. In 1948, plaintiff sold the leasehold interest in the mines to the Sierra Talc & Clay Company together with a number of buildings, machinery, timbers, and a quantity of unsold talc. The reasonable and fair market value of the personalty, exclusive of the timbers and talc, was $7,920. The market value of these items was substantially the same in 1945, the end of the period for which claim is made, and accurately reflects the investment in operating equipment at that time. The 1948 sale price for the leasehold, build-

ings, machinery, timbers, and talc was $25,000.

Although it urged plaintiff to concentrate on the production of lava talc, the defendant did not prohibit the production of ceramic talc and the plaintiff was free to pursue it to the limit of his resources. The only restriction placed upon plaintiff's operations by the defendant was the requirement that the money obtained from the RFC because of the strategic character of the steatitic lava be spent for that purpose rather than to develop the ceramic deposits. Otherwise, there was no restriction placed on the ceramic talc production. In this connection, it is interesting to note that during the period of alleged Government direction of the mines toward the production of lava talc, more than five times as much ceramic talc as lava talc was nevertheless produced. There has been no showing made, then, that the United States forced the plaintiff to restrict his production of ceramic talc below any point which he could have attained. As far as the United States was concerned, as long as plaintiff utilized the proceeds of the RFC loan to develop lava talc, he was free to operate in any manner he chose, and in any manner for which he had the resources, in respect to the ceramic talc. Since the United States was not responsible for plaintiff's inability to develop ceramic talc markets during the years of lava production, we do not see how it can be held accountable for plaintiff's loss of these supposed markets during the succeeding years.

It is therefore our conclusion that the plaintiff has neither a legal nor an equitable claim against the United States and the House of Representatives, pursuant to Resolution 493, 83rd Congress, 2nd Session, will be so informed. The clerk will certify to the Congress this opinion and the findings which follow.

It is so ordered.

REED, Justice (Retired), sitting by designation, JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.